Elizabeth Rose Loveridge #6025
**WOODBURY & KESLER, P.C.**
265 East 100 South, Suite 300
P. O. Box 3358
Salt Lake City, Utah 84110-3358
Telephone: (801) 364-1100

Attorney for Chapter 7 Trustee

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**EDWARD J. EYRING II**<br>**PAIGE EYRING**<br><br>SSN:  XXX-XX-1965<br>SSN:  XXX-XX-8965<br><br>Debtor(s). | Bankruptcy Case No. **09-24781 WTT**<br><br>Chapter 7<br><br>**[ELECTRONICALLY FILED]** |

## CHAPTER 7 TRUSTEE'S MOTION TO APPROVE SALE

Chapter 7 Trustee, Elizabeth R. Loveridge (the "**Trustee**") respectfully moves for an

order authorizing the sale of property of the estate under 11 U.S.C. § 363(b) to Ryan Patano,

Individually ("**Patano**") and on behalf of Alta Medical Management, LLC ("**AMM**"), and Jeffery

Whiting, Individually ("**Whiting**") and on behalf of Alta Medical Management, LLC according

to the terms set forth in the Asset Purchase Agreement (the "**Agreement**") attached hereto as

**Exhibit "1"**. Grounds for this motion are set forth below:

1.     Dr. Edward J. Eyring, II ("**Eyring**") and his wife, Paige Eyring (collectively

referred to herein as the "**Eyrings**") filed a joint voluntary chapter 7 petition on May 11, 2009.

2.      Eyring holds a 20.9% membership interest in AMM.  Eyring also is a creditor of AMM based upon a loan he made pre-petition to AMM for $35,000.00 (the "**Loan**").

3.      Property of the bankruptcy estate (the "**Estate**") includes whatever legal and equitable interest Eyring had in AMM and the Loan.

4.      Under the Agreement, the Trustee proposes to sell the Estate's interest in AMM and the Loan to Patano, individually and on behalf of AMM, and Whiting, individually and on behalf of AMM, in consideration for a cash payment of $35,000.00 and waiver of their claims against the estate.

5.      Patano's, Whiting's and AMM's purchase of the membership interest and the Loan will eliminate any and all interests the Estate has in AMM and the Loan.

6.      The Trustee's marketing of the AMM and the Loan has been limited to soliciting higher and better offers from the Eyrings – both of whom have, to date, declined to make any offer.

7.      The Trustee believes and represents that outside of Patano, Whiting and AMM, and the Eyrings, there is no market for the sale of Eyring's interest in AMM and the Loan. The Agreement and proposed sale, however, are subject to the receipt of higher and better offers received before the hearing set on this motion.

WHEREFORE, the Trustee requests that the Court approve the proposed sale on the basis

that it (1) is in the best interest of the estate and creditors and (2) represents a proper exercise of

business judgment by the Trustee.

DATED this 28th day of July, 2010.

_____/s/_____
Elizabeth Rose Loveridge
Attorney for Chapter 7 Trustee

## CERTIFICATE OF SERVICE

I hereby certify that on July 28th, 2010, I caused a true and correct copy of the foregoing **CHAPTER 7 TRUSTEE'S MOTION TO APPROVE SALE** to be sent via ECF to the registered users as indicated or otherwise mailed, postage prepaid, to:

Office of the United States Trustee
Attn: Rayla Meyer (via ECF)
Ken Garff Building
405 South Main Street
Suite 300
Salt Lake City, UT 84111

Edward J. Eyring II & Paige Eyring
P.O. Box 980752
Park City, UT 84098

Ryan Patano
Jeffery Whiting
Alta Medical Management, LLC
PO Box 572528
Salt Lake City, UT 84157

Gregory J. Adams (via ECF)
MCKAY, BURTON & THURMAN
170 South Main Street, Ste. 800
Salt Lake City, UT 84101

Darwin H. Bingham
Scalley & Reading
15 West South Temple, #600
Salt Lake City, Utah 84101

_____/s/_____
Renée Christensen

EXHIBIT "1"

## ASSET PURCHASE AGREEMENT

This asset purchase agreement (this "**Agreement**") is entered into this _28_ day of July,
2010, by and between Elizabeth R. Loveridge (the "**Trustee**"), in her capacity as the duly-appointed
trustee in the chapter 7 bankruptcy case of Dr. Edward J. Eyring, II ("**Dr. Eyring**") and Paige Eyring
(Bankr. No. 09-24781) (the "**Eyrings**") and Alta Medical Management, LLC ("**AMM**") and Ryan
Patano ("**Patano**") and Jeffery Whiting ("**Whiting**").

### R E C I T A L S:

A.     On May 11, 2009, the Eyrings filed a chapter 7 bankruptcy petition. Property of the
Eyrings' bankruptcy estate (the "**Estate**") includes Dr. Eyring's 20.9% membership interest in Alta
Medical Management, LLC ("**AMM**").

B.     AMM's other members include Ryan Patano ("**Patano**") and Jeffery Whiting
("**Whiting**"). Patano and Whiting each hold a 39.55% membership interest in AMM. (A copy of
the Amended and Restated Operating Agreement of Alta Medical Management, L.L.C. is attached
hereto as **Exhibit "A"** and by this reference incorporated herein.)

C.     Prior to filing his bankruptcy petition, Eyring loaned AMM $35,000.00 (the "**Loan**").
Eyring and AMM did not have a written promissory note memorializing the terms of repayment of
the Loan. Rather AMM and Eyring had an oral agreement that the Loan would be repaid in full with
no interest and no specific payment terms or due date. AMM has not made any payments on the
Loan. The parties agree that AMM owes the Estate $35,000.00.

D.     Dr. Eyring's legal and equitable interests in AMM and the Loan became property of

1

the Eyrings' bankruptcy estate pursuant to 11 U.S.C. § 541 upon the filing of their voluntary chapter 7 bankruptcy petition on May 11, 2009, in the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**").

D.      Patano and Whiting desire to purchase the Estate's legal and equitable interests in AMM and the Loan.

## A G R E E M E N T

Based upon the foregoing Recitals and in consideration of the obligations and conditions set forth herein, and for good and valuable other consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Court Approval: This Agreement is subject to receipt of higher and better offers and to approval by the Bankruptcy Court and shall be effective upon entry of a final order approving the same. The Trustee shall, as soon as reasonably possible after execution of this Agreement, move for Court approval to sell property of the Estate under 11 U.S.C. § 363. Any higher and better offer must be received before the hearing on approval of the Agreement.

2.      Payment: Patano and Whiting shall make payment to the Estate of $35,000 (by certified funds payable to "Elizabeth R. Loveridge, trustee" and delivered to her at 265 East, 100 South, Suite 300, Salt Lake City, Utah 84111) within five days after entry of a final order approving this Agreement.

3.      Release of Claims: Patano and Whiting, individually, and on behalf of AMM, shall release and waive any and all claims against the Estate and shall file a waiver of any proof of claim filed in the Eyrings' bankruptcy case.

4.      Assignment by Trustee: In exchange for the Patano's and Whiting's payment of

2

$35,000.00 and release of claims, the Trustee shall assign to Patano and Whiting, individually, the Estate's interest in AMM and the Loan with each receiving exactly one-half of the Estate's 20.9% interest in AMM and one-half of the Estate's interest in the Loan. The Trustee shall execute any documents to evidence these transfers as may be reasonably requested by the Patano and Whiting.

5.     Representations and Warranties: The Trustee makes no representations or warranties, express or implied, as to the Estate's ownership of, or interest in, AMM or the Loan as described herein; and Patano and Whiting expressly acknowledge that they are purchasing the Estate's interests "as is", "where is", "if is" with no representations or warranties.

6.     Entire Agreement: With the exception of documents submitted to the Bankruptcy Court seeking approval of this Agreement, the terms and conditions of this Agreement constitute the complete, final, and entire Agreement and understanding between the parties concerning the subject matter of this Agreement.

7.     Governing Laws: This Agreement shall be governed by and construed in accordance with the laws of the State of Utah.

8.     Counterpart / Facsimile: This Agreement may be executed in counterparts, which together shall constitute a fully executed original. Facsimile pages shall be deemed to be the same as originals.

9.     Default: Upon the default of either party on the obligations contained herein, the non-defaulting party shall be entitled to interest on any monetary obligations at the rate of 10% per annum and reimbursement of reasonable costs and attorneys fees expended to enforce this Agreement.

3

DATED this _____ day of August, 2010.

_____
Elizabeth R. Loveridge, trustee

_____
Ryan Patano
Individually, and on behalf of
Alta Medical Management, LLC

_____
Jeffery Whiting
Individually, and on behalf of
Alta Medical Management, LLC

4

# EXHIBIT "A"
## To Asset Purchase Agreement

## AMENDED AND RESTATED
## OPERATING AGREEMENT
### OF
## ALTA MEDICAL MANAGEMENT, L.L.C.

This Amended and Restated Operating Agreement of Alta Medical Management, L.L.C., a limited liability company organized under the laws of the State of Utah (the "Company"), is made as December 31, 2008, by the Persons identified in Exhibit A, who are all of the Members of the Company. This Agreement supersedes, in its entirety, the Operating Agreement made as of April 10, 2006 by the Members.

### ARTICLE 1
### DEFINITIONS

Certain terms used in this limited liability company Operating Agreement shall have special meanings as designated in this Article:

1.1    *Act.* The term "Act" shall mean the Utah Revised Limited Liability Company Act, as set forth in Section 48-2c-101 et seq., Utah Code Annotated, 1953, as amended from time to time.

1.2    *Additional Member.* The term "Additional Member" means any Person (other than a Substitute Member) who hereafter is admitted to the Company with all the rights of a Member, pursuant to Article 9 of this Agreement.

1.3    *Agreement or Operating Agreement.* The term "Agreement" or "Operating Agreement" shall mean this Amended and Restated Operating Agreement as the same may be modified or amended from time to time in accordance with Section 12.1 hereof, along with any attachments, schedules, or exhibits.

1.4    *Articles.* The term "Articles" shall mean the most recent version of the Articles of Organization of the Company filed with the Division.

1.5    *Assignee.* The term "Assignee" shall mean a Person to whom a Member has assigned, in whole or in part, his Membership Interest in accordance with, and not in violation of, any of the provisions of this Agreement, but who has not satisfied the requirements for becoming either an Additional Member or a Substitute Member of the Company, as provided for herein.

1.6   *Available Cash*. The term "Available Cash" means for any applicable accounting period (a) the net income of the Company (after allowance for all expenditures of any kind paid or incurred during the period in question in carrying on the trade or business of the Company, including any interest, charges and fees pertaining to the Company's indebtedness), less (b) the amount of expenditures for payment of principal on any debt of the Company during the period in question, and less (c) the amount of expenditures for the payment of capital items not normally considered to be expenses in determining net income for the period in question, and (d) less increases (or plus decreases) in the amount of working capital (for this purpose defined as non-cash current assets less current liabilities) during the period in question, and other reserves as the Company may deem to be necessary (for such items as anticipated working capital requirements, amounts to be utilized by the Company in the future for the payment of principal balances of any loans, amounts of any expenditures or costs to be made or incurred by the Company of a capital nature, and amounts which the Company deems necessary to retain in the Company in order to finance additional Company activities or otherwise to meet Company obligations) (sometimes referred to herein as "Reserves"), and plus (e) the amount of noncash expenses, such as depreciation and amortization, accrued during the period in question, used to determine net income for that period and not offset by a corresponding capital or other expenditure which cannot be expended during that period.

1.7   *Book Value*. The term "Book Value" means, with respect to any assets to be contributed to the Company, the value on the books of the owner of the assets prior to contribution to the Company, and with respect to any Company assets, the Company's adjusted basis for federal income tax purposes adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulations § 1.704-1(b)(2)(iv)(d)-(g).

1.8   *Capital Account*. The term "Capital Account" shall refer to a Member's equity in the Company as described and adjusted in Article 3 of this Agreement.

1.9   *Capital Contribution*. The term "Capital Contribution" shall mean any contribution made (or deemed to have been made) by a Member to the capital of the Company in (a) cash, (b) in the amount of the fair market value of any property other than cash (net of any liabilities secured by such property that the Company is considered to have assumed or take subject to under Section 752 of the Code), including but not limited to the contribution by the Founding Member of certain contracts which they have secured to acquire the real property which the Company expects to be the principal asset of the Company, (c) in the amount of the fair market value of any services, or (d) a binding obligation to contribute any such cash, property or services, whenever made.

1.10   *Code*. The term "Code" shall mean the Internal Revenue Code of 1986, as amended, including any applicable Treasury Regulations promulgated thereunder.

1.11   *Company*. The term "Company" shall mean the Utah limited liability company to be formed hereunder, and as the same shall exist hereafter, pursuant to this Agreement and the

Articles, and in accordance with Section 48-2c-101 et seq., of the Act, the name of which currently is Alta Medical Management, L.L.C.

1.12 *Designated Office.* The term "Designated Office" shall have the meaning as set forth in Section 48-2c-111 of the Act, and shall be located at the place provided in Section 2.3 of this Agreement.

1.13 *Division.* The term "Division" refers to the Division of Corporations and Commercial Code of the Utah Department of Commerce, or any other department of division of the State of Utah which hereafter may be given responsibility for administering the Act and/or accepting filings in behalf of the Company.

1.14 *Effective Date.* The term "Effective Date" shall mean the date of this Amended and Restated Operating Agreement.

1.15 *Manager.* The term "Manager" shall mean any such manager designated in accordance with Article 6 hereof, during the period of such responsibilities. The current managers are Edward Joseph Eyring, Ryan Patano and Jeffrey Whiting, and they shall continue to serve as such until their management is terminated pursuant to Article 6 hereof or the provisions of the Act.

1.16 *Members.* The "Members" of the Company are those Persons owning Membership Interests in the Company whose names appear on Exhibit A, which is incorporated herein, or any Person who is permitted to be, and becomes, a Substitute Member or an Additional Member of the Company, in accordance with the provisions of Article 9 hereof.

1.17 *Membership Interest.* The term "Membership Interest" shall mean the ownership interest of a Member (and not an Assignee) in the Company, together with all of the rights and obligations that are granted to Members under this Agreement, which may be expressed as a percentage equal to such Member's Capital Account divided by the aggregate Capital Accounts of all Members. The Membership Interests of the initial Members of the Company are set forth in Article 3. Changes in Membership Interests after the Effective Date, including those necessitated by the admission and termination of Members, may be recorded from time to time in a revision to Exhibit A attached to this Agreement.

1.18 *Net Sales Proceeds.* The term "Net Sales Proceeds" means the cash or value of other consideration received by the Company in connection with any transfer of any property less the total of (i) the amount of any liabilities of the Company paid in connection with such transfer and (ii) the actual and reasonable expenses of the Company incurred in connection with the sale, including the costs of any title insurance, attorneys' fees, sales commissions, or other customary costs and expenses.

1.19   *Person.*  The term "Person" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such individual or entity where the context so requires.

1.20   *Proportionate Share.*  The term "Proportionate Share" shall refer to the percentage interest of each Member in the income, gain, loss, deductions or credit and voting power of the Company, as provided in Article 3 of this Agreement.

1.21   *Profits and Losses.*  The terms "Profits" and "Losses" shall mean, for each calendar year or shorter period for which it is necessary to make such an allocation (an "Allocation Period"), an amount equal to the Company's taxable income or loss for such Allocation Period, determined in accordance with Code § 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments: (a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (b) any expenditures of the Company described in Code § 705(a)(2)(B) or treated as Code § 705(a)(2)(B) expenditures pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (c) the depreciation, amortization and other cost recovery deductions  taken by the Company in accordance with generally accepted accounting principles consistently applied for prior periods; (d) to the extent an adjustment to the adjusted basis of any Company asset pursuant to Code § 734(b) or 743(b) is required, pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and (e) notwithstanding any other provision of this definition, any items of Company income, gain, loss and deduction specially allocated pursuant to Articles 3 and 4 shall not be taken into account in computing Profits and Losses.

1.22   *Substitute Member.*  The term "Substitute Member" shall mean any Person who is a transferee of a Member's Membership Interest, and who is admitted to the Company with all the rights of the transferor Member, pursuant to the provisions of Articles 8 and 9 of this Agreement.

1.23   *Treasury Regulations.*  The term "Treasury Regulations" shall mean those regulations promulgated by the Secretary of the U.S. Treasury under the Code.

1.24   *Usage in General.*  The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Except where the context clearly requires to the contrary: (a) all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement;

(b) the symbol "§" denotes a section of the Act, the Code, or the Treasury Regulations, as indicated; (c) instances of gender or entity specific usage (e.g., "his," "her," "its," "person" or "individual"), shall include the masculine, feminine and neuter, and shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (d) the word "or" shall not be applied in its exclusive sense, unless the context otherwise requires; (e) "including" shall mean "including, without limitation"; (f) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the Effective Date of this Agreement) and shall include all successor rules and instruments thereto; (g) references to "$," "cash" or "dollars" shall mean the lawful currency of the United States; (h) references to "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof); (i) references to "days" shall mean calendar days; (j) references to monthly or annual anniversaries shall be to the actual calendar months or years at issue (taking into account the actual number of days in any such month or year); (k) days and times of day shall be determined by reference to local time in Salt Lake City, Utah; and (l) whenever in this Agreement a Person is permitted or required to make a decision in its "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interests of, or factors affecting, the Company or any other Person.

## ARTICLE 2
### FORMATION OF THE COMPANY

2.1    *Creation.* The Company has been formed pursuant to the Act, by the filing of the Articles with the Division on April 11, 2006. Pursuant to Sections 48-2c-502 and 48-2c-1901 of the Act, the Members hereby agree that, except to the extent that the provisions of the Act cannot be altered or changed by the Articles or this Agreement, where the provisions of the Articles or this Agreement conflict with the provisions of the Act, the provisions of the Articles or this Agreement shall control. With respect to any matter not provided for in the Articles or this Agreement, or to the extent that the provisions of the Act cannot be altered or changed by the Articles or this Agreement, then the terms and provisions of the Act shall apply.

2.2    *Company Name.* The name of the limited liability company created hereunder shall be Alta Medical Management, L.L.C., and the business of the Company shall be conducted under that name in the State of Utah and under such name or variations thereof, as the Members deem necessary or appropriate to comply with the requirements of any other jurisdiction in which the Company may elect to do business. The Members will use their best efforts to take the action required to comply with the Act, assumed name act, fictitious name act, or similar statute in effect in each jurisdiction or political subdivision in which the Company proposes to do business.

2.3    *Company Offices and Agent for Service of Process.* The designated place of business of the Company, where the Company records as specified in the Act shall be kept as

designated in the Articles or amendments thereto, shall be 348 East 4500 South, Suite 220, Murray, Utah 84107. Legal process may be served on the Company's agent for service of process, Jeffrey Whiting, at 348 East 4500 South, Suite 220, Murray, Utah 84111. The Members may from time to time change the designated place of business of the Company, and amend the Articles to reflect such change, and may in their discretion establish additional places of business of the Company. The Members may from time to time designate another agent for acceptance of service of process and amend the Articles to reflect such change.

2.4    *Names and Addresses of Members.* The full names and business street addresses of the Members of the Company are set forth on Exhibit A, which is incorporated herein, as the same may be revised from time to time to reflect changes in the information contained therein.

2.5    *Number of Members.* The Members identified herein shall constitute all of the Members in the Company, and, except as expressly provided for herein, no additional Members shall be admitted to the Company. The Members shall not sell or assign their interests in the Company except as provided in Article 8 of this Agreement.

2.6    *Character of Business.* The business purposes for which the Company is organized are: (a) providing financial services to health care professionals; (b) to purchase, own, lease, sell, exchange, develop and construct improvements upon, finance the acquisition, operation and development of, and the construction of improvements upon, to operate and maintain for any uses, and otherwise deal with and in, real property, or interests therein, wherever located, in connection with the business of the Company; (c) to purchase, lease, sell, own and operate, and finance the acquisition and operation of, personal property in connection with the business of the Company; (d) to incur indebtedness, secured or unsecured, for any of the purposes of the Company; and (e) engage in any other lawful business activity permitted under the laws of the State of Utah.

2.7    *Title to Company Property.* Title to property acquired by or contributed to the Company shall be placed in the name of the Company and shall remain in the Company's name for as long as the Company owns the property.

2.8    *Period of Duration.* The period of the Company's duration or term shall be ninety-nine (99) years commencing on April 11, 2006; provided, however, the Company may be dissolved prior to the end of such term in accordance with the provisions of Article 10, below.

### ARTICLE 3
### MEMBERS, CAPITALIZATION, AND ADDITIONAL FINANCING

3.1    *Members' Contributions.* The respective Membership Interests of the Members are as set forth in Exhibit A, which is incorporated herein. The Manager is hereby authorized and directed, without any vote or consent of the Members, to update and amend Exhibit A from time to time to accurately reflect the Capital Contributions of the Members, and any other information set forth thereon.

The Members may from time to time make additional contributions, as provided for herein. Each such contribution may be satisfied in cash or by a contribution of an interest in property equal in value to the specified contribution amount for each Member. The Members have not agreed to and are not obligated to make any other contributions. No interest shall be paid to the Members on their individual Capital Accounts of the Company or on any subsequent Capital Contributions made by the Members.

3.2    *Additional Funds and Assessments*. As indicated above, the Members shall not have any obligation to make additional contributions to the Company. As indicated in the second paragraph of this Section 3.2 and in Section 3.3, below, the Company may borrow funds to finance its operations. In the event additional funds are required to maintain, operate or carry expenses of any Company property, or to operate the Company, or to satisfy any Company debts or liabilities, the Members shall first be given the opportunity within a reasonable period of time, not to exceed thirty (30) days, to provide such additional funds in the same proportion that their Capital Account bears to the total of the Capital Accounts of all of the other Members, or if any Member chooses not to participate, in the ratio that the Capital Account of each participating Member bears to the Capital Accounts of all Members who choose to participate. Any funds advanced under this Paragraph shall be added to the contributing Member's Capital Account, and the Proportionate Shares of all Members shall be adjusted at that time to correspond to the percentage of Company capital represented by each Capital Account.

Before or after the expenditure or commitment of Company capital, the Manager or Members, as appropriate, may, but shall not be obligated to, obtain or provide additional financing for Company activities by any method which they believe to be appropriate under the circumstances, including borrowing funds for or loaning funds to the Company. A creditor who makes a nonrecourse loan to the Company will not have or acquire at any time as a result of making the loan, any direct or indirect interest in the profits, capital or property of the Company other than as a secured creditor.

3.3    *Borrowing*. The Company may borrow, at the discretion of the Manager or Members, as appropriate, from banks, lending institutions, or other unrelated third parties, or from affiliates of the Company or the Members, and may pledge Company properties or any income therefrom to secure or provide for the repayment of any such loans.

3.4    *Capital Accounts*. Separate Capital Accounts shall be established and maintained for each Member.

3.5    *Withdrawal and Return of Capital.* No Member may withdraw or demand withdrawal of any portion of its Capital Contribution or Capital Account balance. Except as otherwise provided in Article 4 or Article 10, no Member shall be entitled to return of such Member's Capital Contributions, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's interest in the Company. Each Member shall look solely to the Company assets for the return of his contributions to Company

capital, and if the Company assets are insufficient to return such contributions, he or she shall have no recourse against any other Member for that purpose. The provisions of Article 10 shall govern the procedure and computation of amounts available for distribution upon dissolution of the Company. Nothing in this paragraph is intended to modify the priority returns provided for elsewhere in this Agreement.

3.6   ***Return of Capital.*** Each Member shall look solely to the Company assets for the return of his contributions to Company capital, and if the Company assets are insufficient to return such contributions, he or she shall have no recourse against any other Member for that purpose. The provisions of Article 10 shall govern the procedure and computation of amounts available for distribution upon dissolution of the Company. Nothing in this paragraph is intended to modify the priority returns provided for elsewhere in this Agreement.

3.7   ***Taxation.*** Although the Company is a limited liability company, it is the intent of the Members that the Company shall be, to the extent permissible by applicable law, treated as a partnership for federal and applicable State tax purposes and, accordingly, (a) no Member shall file any election with any taxing authority to have the Company treated otherwise, and (b) each Member hereby represents, covenants, and warrants that it shall not maintain a position inconsistent with such treatment. The Managers agree that, except as otherwise required by applicable law, they (c) will not cause or permit the Company to elect (i) to be excluded from the provisions of Subchapter K of the Code, or (ii) to be treated as a corporation (or association treated as a corporation) for any federal, State or local income tax purposes; (d) will cause the Company to make any election reasonably determined to be necessary or appropriate in order to ensure the treatment of the Company as a partnership for all income tax purposes; (e) will cause the Company to file any required tax returns in a manner consistent with its treatment as a partnership for income tax purposes; and (f) has not taken, and will not take, any action that would be inconsistent with the treatment of the Company as a partnership for such purposes. In addition, except as otherwise expressly provided for herein, all Capital Accounts will be maintained in accordance with the Code and the Regulations, including: (g) no allocation shall be made to a Member to the extent that the allocation causes or increases a deficit balance in the Capital Account of that Member at the end of the taxable year of the Company to which the allocation relates after the Capital Account has been reduced as required by Treasury Regulations § 1.704-1(b)(2)(ii)(d); and (h) in the event any Member unexpectedly receives an adjustment, allocation, or distribution that results in a deficit balance in such Member's Capital Account, there shall be allocated to such Member items of Company income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible in accordance with Treasury Regulations § 1.704-1(b)(2)(ii)(d).

## ARTICLE 4
### ALLOCATIONS, PROFITS AND LOSSES, AND DISTRIBUTIONS

4.1    ***Allocations among Members***.  Subject to the provisions of this Section 4.1, the Profits and Losses of the Company, including gains and losses from the sale of Company property and any items of income, deduction, gain, loss or credit required by the Code to be separately reported, shall be allocated to each Member as follows:

(a)    Profits for each Allocation Period shall be allocated to Members as follows:

(1)    First, as necessary to offset any net Losses previously allocated to such Members pursuant to this Section until each Member has been allocated cumulative Profits equal to the cumulative Losses previously allocated to such Member and not already offset under this Section.

(2)    Second, to the Members in proportion to their respective Membership Interests.

(b)    Losses for each Allocation Period shall be allocated to Members as follows:

(1)    First, as necessary to offset any net Profits previously allocated to such Members pursuant to this Section until each Member has been allocated cumulative Losses equal to the cumulative Profits previously allocated to such Member and not already offset under this Section.

(2)    Thereafter, to the Members in proportion to their respective Membership Interests.

Notwithstanding the percentages for allocating net Losses hereinabove set forth: (a) no Company item attributable to any loss or injury caused to the person or property of any third party (including any penalty in connection therewith) shall be allocated to the Members and (b) any deductions attributable to any payments made by a Member on behalf of the Company which payment is used to satisfy any interest and/or tax obligation of the Company, shall be allocated to the Member making such payment.

4.2    ***Liability of Members***.  No Member shall personally be liable for any of the losses of the Company beyond his Membership Interest in the Company.

4.3    ***Distributions***.  Unless the Members unanimously agree to a different use and distribution of the Company's funds, Available Cash shall be used by the Company in accordance with the following standards:

       (a)     First, Available Cash shall be retained by the Company as Reserves as may be deemed necessary by the Members or Managers to be used by the Company for any of its stated purposes.

       (b)     Second, the Company, at the discretion of the Members, may make distributions of the balance of any Available Cash to the Members on a quarterly basis in accordance with the Proportionate Share of each Member.

    4.4    ***Distributions in Kind***.  The Company, at the discretion of the Members, may make distributions in kind.  All Members must accept distributions in kind, including a distribution of any asset in kind to the extent that the percentage of the asset distributed to the Member exceeds the percentage of that asset which is equal to the percentage in which the Member shares in distribution from the Company.

**ARTICLE 5**
**ACCOUNTING FOR THE COMPANY; RECORDS; MEETINGS**

    5.1    ***Accounting Methods; Fiscal Year***.  Profits and Losses of the Company shall, unless otherwise required under the Code, be determined on a cash basis in accordance with generally accepted accounting principles of cash accounting.  The Company also shall, unless otherwise required under the Code, report for income tax purposes on a cash basis.  The fiscal year of the Company, for both accounting and tax reporting purposes, shall be the calendar year.

    5.2    ***Review of Financial Statements; Location and Inspection of Records***.  The financial statements, tax returns, books and records, and all other documents required to be kept at the Company's Designated Office pursuant to Act § 48-2c-112 shall be kept at the Designated Office.  Such documents shall be subject to inspection and copying at the reasonable request and at the expense of any Member during ordinary business hours.

    5.3    ***Meetings***.  Meetings of the Members are not required, but may be called and held subject to the provisions of Section 5.4, below.

    5.4    ***Procedure for Meetings if Called***.  In the event that a meeting of the Members is held, the procedure for calling and conducting said meeting shall be as follows:

       (a)     <u>Right to Call Meetings</u>.  Any Member or combination of Members whose combined Membership Interests exceed fifty percent (50%) of the aggregate Membership Interests may call a meeting of the Members by giving written notice to all Members no less than three (3) nor more than sixty (60) days prior to the date of the meeting.  The notice must specify the date of the meeting and the nature of any business to be transacted.  A Member may waive notice of a meeting of Members orally, in writing, or by attendance at the meeting.

       (b)     <u>Proxy Voting</u>.  A Member may act at a meeting of Members through a Manager or another Member who is authorized by signed proxy.

(c)    <u>Telephonic Attendance at Meeting</u>.  Members may participate in and be considered present at any meeting by, or the meeting may be conducted through the use of, any means of communication by which all persons participating in the meeting may hear each other, or otherwise communicate with each other during the meeting.

(d)    <u>Quorum</u>.  Members whose aggregate Membership Interests exceed fifty percent (50%) of all Membership Interests will constitute a quorum at a meeting of Members.  No action may be taken in the absence of a quorum.

(e)    <u>Required Vote</u>.  Except with respect to matters for which a greater minimum vote is required by this Agreement (or by any provision of the Act which cannot be changed by this Agreement), the vote of Members present or represented by proxy whose aggregate Membership Interests exceed fifty percent (50%) of the aggregate interest of all Members represented at the meeting will constitute the act of the Members at a meeting of Members.

(f)    <u>Written Consent</u>.  The Members may act without a meeting by written consent describing the action and signed by Members whose aggregate Membership Interests are at least equal to the minimum that would be necessary to take the action at a meeting at which all Members were present.

(g)    <u>No Minutes Required</u>.  Minutes from meetings shall not be required.

## ARTICLE 6
## MANAGEMENT OF COMPANY

6.1    *Management by Managers*.  Management of the Company may be vested in one or more Managers, as appointed by the Members from time to time.  The current Managers of the Company are Edward Joseph Eyring, Ryan Patano and Jeffrey Whiting, and they shall continue to serve as such until such time as their death, resignation, or removal pursuant to this Article 6.  The vote of a majority of the Managers shall be considered the act of the Managers.  In the event that all of the Managers of the Company have been removed from office as provided in this Article 6, the business of the Company shall be under the exclusive management of the Members, and in such case, the agreement of a majority in interest of the Members (in accordance with the Members' Membership Interests) shall be necessary for all decisions affecting the Company, and individual Members shall have no power as such.

6.2    *Management by Members*.  At all times when there are not one or more Managers appointed to act hereunder by the Members pursuant to Section 6.1 above, all business of the Company shall, as indicated above, be under the exclusive management of the Members and the agreement of a majority in interest of the Members (in accordance with the Members' Membership Interests) shall be necessary for all decisions affecting the Company, and individual Members shall have no power as such.  All actions which are to be or may be taken by or on

behalf of the Company, or regarding the management of the Company, by the Managers of the Company, as provided herein or under the Act, shall be taken by the Members at all times when there is no Manager acting hereunder. Until such time as a Manager is appointed pursuant to Section 6.1, management of the Company shall be vested in the Members.

6.3    *Authority of Managers*. The Managers may exercise all the powers of the Company whether derived from law, the Articles of Organization or this Agreement (except such powers as are by statute, by the Articles of Organization or by this Agreement vested solely in the Members), and shall have the right, power and authority to do on behalf of the Company all things which are necessary or desirable to carry out the business of the Company, including, but not limited to, the right, power and authority: to sell, exchange, or grant an option for the sale or exchange of all or any portion of the property of the Company; to invest and reinvest any available funds; to incur all reasonable expenditures; to employ and dismiss from employment any and all employees, agents, independent contractors, attorneys, and accountants; to lease all or any portion of any property for any purpose and without limit as to the term thereof, provided such term does not exceed the term of the Company as set forth in the Articles and in Section 2.8, above; to borrow money, and as security therefor, to mortgage or grant security interests in all or any part of any property; to prepay in whole or in part, refinance, modify, or extend any indebtedness; to do any and all of the foregoing at such price, rental or amount, for cash, securities, or other property and upon such terms as the Managers deem proper; to place record title to any property in the name of the Company; to adjust, compromise, settle, or refer to arbitration any claim against or in favor of the Company or any nominee, and to institute, prosecute, and defend any legal proceeding relating to the business or property of the Company; to delegate all or any portion of the powers granted hereunder to one or more attorneys-in-fact; and to execute, acknowledge and deliver any and all instruments to effectuate any and all of the foregoing.

6.4    *Delegation of Powers; Officers*. The Managers of the Company may delegate their management powers to officers appointed by the Managers from time to time. The Managers may designate, in writing, any officer to have any particular title and/or function. If the Managers determine it is appropriate and in the best interests of the Company to appoint officers, then such officers shall have the following authority, powers, duties and/or responsibilities, to the exclusion of any other officer not so titled; provided, however, that each of the Managers shall continue to have all such managerial authority granted by the Articles and this Agreement:

(a)    President. The President (if any) would serve the same function for the Company as the president of a corporation would serve. The current President is Jeffrey Whiting. Under the direction of the Managers, the President is the principal executive officer of the Company and, in general, supervises and controls all of the day-to-day business and affairs of the Company. With the approval of the Managers, the President may sign deeds, mortgages, bonds, contracts, or other instruments, except in cases where the signing and execution thereof shall be expressly delegated by the Managers or this Agreement to some other officer or agent of

the Company, or shall be required by law to be otherwise signed or executed. In general, the President shall perform all duties incident to the chief executive officer of the Company.

      (c)    <u>Vice President</u>. The Vice President (if any) would be the next most senior officer to the President and would serve the same function for the Company as the most senior Executive Vice President or Vice President of a corporation would serve. The current Vice President is Ryan Patano. At the request or in the absence or disability of the President, the Vice President would be the principal executive officer of the Company and would, in general, supervise and control all of the day-to-day business and affairs of the Company, and, when so acting, he shall have all the powers of, and be subject to all the restrictions upon, the President. With the approval of the Managers, the Vice President may sign deeds, mortgages, bonds, contracts, or other instruments, except in cases where the signing and execution thereof shall be expressly delegated by the Managers or this Agreement to some other officer or agent of the Company, or shall be required by law to be otherwise signed. In general, the Vice President shall perform all duties incident to the executive who is next most senior in authority to the President of the Company.

      (e)    <u>Secretary</u>. The Secretary (if any) of the Company shall perform the following duties on behalf of the Company:

      (1)    Keep the minutes of the proceedings of the Members and Managers of the Company and the other records and information of the Company required to be kept, in one or more books provided for that purpose;

      (2)    See that all notices are duly given in accordance with the provisions of this Agreement, and the Articles, or any other agreement to which the Members of the Company or their affiliates may become a party, as required by law;

      (3)    When requested or required, authenticate any of the Company's records;

      (4)    Keep a register of the post office address of each Member and/or affiliate of a Member which shall be furnished initially to the Secretary by such Member;

      (5)    In coordination with the accountants of the Company, and subject to the oversight of the Managers, have general charge of the Members' Capital Accounts and Membership Interests, as those terms are defined in the Operating Agreement; and

      (6)    In general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to the Secretary by the President or the Managers.

      (f)    <u>Treasurer</u>. Subject to the oversight of the Managers, the Treasurer (if any) shall perform the following duties on behalf of the Company:

(1)    Have charge and custody of and be responsible for all funds and securities of the Company;

(2)    Receive and give receipts for moneys due and payable to the Company from any source whatsoever, and deposit all such moneys in the name of the Company in such banks, trust companies, or other depositories as shall be selected by the Managers; and

(3)    In general perform all of the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to the Treasurer by the President or the Managers.

(g)    Any other titled officers shall have such authority, powers, duties and/or responsibilities as shall be delegated to them by the Managers or the President, except in cases where such matters have be expressly delegated by the Members or by this Agreement to some other Manager or employee or agent of the Company, or shall be required by law to be handled otherwise.

6.5    *Restrictions on Managers.*  No Manager or Managers  shall, without the written consent or written ratification of the specific act by all the Members:

(a)    Do any act in contravention of law, the Articles of Organization or this Agreement.

(b)    Do any act to make it impossible to carry on the ordinary business of the Company.

(c)    Confess a judgment against the Company.

(d)    Possess Company property in their own name or assign their rights in specific Company property for other than a Company purpose.

(e)    Admit a person as a Member except as otherwise provided in this Agreement.

(f)    Continue the business with Company property after its bankruptcy, dissolution, cancellation or other cessation to exist.

6.6    *Number, Term and Qualifications.*  The Company may have one or Managers. Appointment of Manager(s) or increases or decreases in the number of Managers may be made as the Members shall from time to time determine, by unanimous agreement, or by amendment to this Agreement.  Each Manager shall hold office until his successor shall have been appointed. Managers need not be Members of the Company.

6.7    *Manner of Acting*. Unless provided otherwise by amendment to this Agreement, at all times that there are more than one Manager appointed by the Members, the majority vote of all Managers shall be necessary for all decisions affecting the Company, and individual Managers shall have no power as such. In the event the Managers are unable to agree to a particular course of action with respect to a decision affecting the Company, then a vote of a majority in interest of the Members, based upon their Membership Interests, shall control.

6.8    *Appointment and Removal*. Managers may be appointed only by the unanimous approval of the Members of the Company. Any Manager or Managers may be immediately and permanently removed, with or without cause, upon the written request of a majority in number of the Members (without regard to their Proportionate Share of the Company).

6.9    *Bank Accounts*. The Company shall maintain checking or other accounts in such bank or banks as the Members or Managers shall determine and all funds received by the Company shall be deposited therein and withdrawn therefrom under such general or specific authority as the Members shall grant to the Managers.

6.10    *Time and Attention Required of Managers*. The parties understand that the Managers have other business activities that take a substantial portion of their time and attention. Accordingly, the Managers are required to devote to the business of the Company only the time and attention that they in their sole discretion shall deem necessary.

6.11    *Fiduciary Duties*.

(a)    Standard of Care.

(1)    *Liability for Wrongful Acts*. A Manager is liable to and will indemnify the Company for all costs, expenses or damages attributable to an act or omission that constitutes a material breach of this Agreement, gross negligence, willful misconduct, or a violation of law.

(2)    *Justifiable Reliance*. A Manager may rely on the Company's records maintained in good faith and on information, opinions, reports or statements received from any Person pertaining to matters the Manager reasonably believes to be within the Person's expertise or competence.

(b)    Competing Activities. A Manager may participate in any business or activity without accounting to the Company or the Members. A Manager may not, however, accept a business opportunity for the Manager's own account that the Manager believes or has reason to believe the Company would accept if brought to its attention. A Manager must disclose to the Company any business opportunity of which the Manager becomes aware. If the Company declines to accept the opportunity, the Manager may pursue it for the Manager's own account. If the Manager fails to disclose the opportunity, the Manager will account to the Company for any

income the Manager derives from the opportunity and will indemnify the Company for any loss the Company incurs as a result of the failure to disclose.

(c)   Self-Dealing.  A Manager may enter into a business transaction with the Company if the terms of the transaction are no less favorable to the Company than those of a similar transaction with an independent third party.  Approval or ratification by Members having no interest in the transaction constitutes conclusive evidence that the terms satisfy the foregoing condition.

6.12   *Indemnification.*  The Company shall indemnify and save harmless the Managers and any officers to whom management powers are delegated by a Manager from any personal loss or damage incurred by such Managers or officers by reason of any act performed by such Managers for and on behalf of the Company and in furtherance of its interests.

### ARTICLE 7
### CONTINUATION OF COMPANY IN CERTAIN EVENTS

7.1   *Withdrawal by a Member.*  A Member may withdraw upon the advance written consent of (a) the Managers or (b) all of the Members.

7.2   *Dissociation of Member.*

(a)   Definitions.  The following events shall be deemed a "Dissociation" from the Company by a Member (such Member hereinafter sometimes referred to as a "Dissociating Member"):

(1)   The death of a Member;

(2)   The expulsion of a Member; provided, however, that a Member may not be expelled from the Company except as provided in Section 48-2c-710(3) of the Act with respect to a judicial determination upon application by the Company or another Member that such Member should be expelled.

(3)   The insolvency of, the commission of any one of the acts set forth in Section 48-2c-708(1)(f)(i) or (ii) of the Utah Code by, or the dissolution of, a Member.

(b)   Effect of Dissociation.  Upon the occurrence of any of the foregoing events of Dissociation, the Company shall continue its operations and no dissolution of the Company shall take place.  The Company shall be dissolved only in accordance with the provisions of Article 10, below.  If under the Act the Dissociation of a Member is an event which requires that an Amendment to the Articles be filed with the Division or some other authority, or that some other action be taken by the Company, then within the time provided for under the Act for the filing of such an Amendment or taking such other action, the remaining Members shall cause such an Amendment to be properly filed or such other action to be taken.  Provided,

however, that failing to make any such filing or take any such other action in a timely manner shall not result in a termination or dissolution of the Company.

(c)    Purchase of Dissociating Member's Membership Interest Upon Dissociation.  After a Dissociation, the Company, or if the Company determines that it is not able or willing to do so, then the remaining Members, in that order, shall have the right, at their election, by providing the Dissociating Member, or his legal representative(s) if he is deceased, with written notice within six (6) months of the date of the Dissociation, to purchase the Dissociating Member's Membership Interest.  The price to be paid for the Dissociating Member's Membership Interest shall be its fair market value, as that term is defined in Section 48-2c-904 of the Act (the "Fair Market Value"), as the purchasing party and the Dissociating Member, or the legal representative(s) of the Dissociating Member if he is deceased, may agree.  If the parties cannot agree upon the Fair Market Value after written notice of exercise of the purchase option is given, then the Managers and the Dissociating Member or the Dissociating Member's legal representative(s) shall each select an independent appraiser, and those appraisers shall select a third appraiser, and this third appraiser shall determine the Fair Market Value of the Dissociating Member's Membership Interest.  The parties shall act in a reasonable manner, and within a reasonable time, not to exceed three (3) months from the date the option to purchase is exercised, to complete the valuation of the Dissociating Member's Membership Interest.  Once the Fair Market Value has been determined, it shall then be paid to the Dissociating Member or his representative in annual or more frequent installments over a period not to exceed ten (10) years from the date of the date the option to purchase is exercised.

If the interest of a Dissociating Member is not purchased in the manner provided for above, the successors-in-interest to his Membership Interest shall become Assignees, and shall not become Substitute Members unless and until they are made Substitute Members by the other Members in accordance with the provisions of Article 9, below.

## ARTICLE 8
## TRANSFER OF MEMBER INTEREST

8.1    *Transfer by a Member.*  A Member may not sell, assign or otherwise transfer all or any part of his or her interest in the Company without either receiving the written consent of all Members or satisfying the provisions of the remaining sections of this Article 8 regarding offering the Company and the other Members of the Company the option to acquire such interest.  Notwithstanding the foregoing, nothing contained in this Article shall prevent the income interest of any Member from being transferred or disposed of by Will or intestacy to his or her immediate family or transferred during his or her lifetime, by gift or inter vivos trust, to or for the benefit of his or her immediate family; provided, however, that in respect of transfers by way of testamentary or inter vivos trust, the trustee shall be a member of the Member's immediate family; provided further, that such a transfer to a Member's immediate family shall not operate to transfer a right to participate in the management of the Company without the consent of a majority of the nontransferring Members. For purposes of this paragraph, "immediate family" is defined as including the spouse, child, grandchild, father, mother, sister or brother of a Member.

A Member may transfer his or her entire interest outright by Will or intestacy to his or her immediate family, or during his or her lifetime, by gift or inter vivos trust, to or for the benefit of his or her immediate family; provided, that the Member first obtain the unanimous written consent of the other Members, and provided further that in respect of transfers by way of testamentary or inter vivos trust, the trustee shall be a member of the Member's immediate family.

8.2    *Provision to Avoid Termination Under the Code.*  In order to protect the continuity of the Company for purposes of Section 708 of the Code, if there is more than one Member of the Company, the Members may prohibit any transfer or assignment of any interest in the Company if such interest together with all other interests assigned or transferred during the preceding twelve (12) consecutive month period, represent a combined interest of fifty percent (50%) or more in Company Capital or profits.  This paragraph shall not be construed to limit the Members' power to refuse to consent to any transfer under Section 8.1.

8.3    *Requirements of Transferee.*  Subject to the other provisions of this Article, any Member who desires to transfer all or any part of his or her interest and who obtains the consent of the Members to such transfer shall comply with the requirements of Section 8.4 and shall arrange for his or her transferee to be bound by this Agreement, as it may then be amended, by having such transferee execute two counterparts of an instrument of assignment satisfactory in form to the Company and by delivering the same to the Company together with any such other information that may be required by counsel to the Company.  The transferee may be required to pay any and all reasonable filing and recording fees, legal fees, accounting fees, and other charges and fees incurred by the Company and its counsel as a result of such transfer.  Each assignment or transfer shall be effective on the Company records as of the first day of the calendar month following the month during which the Company actually receives the aforesaid instrument of assignment executed by both the transferor and transferee; however, no attempted assignment or transfer shall be effective or recognized by the Company or the Members until all requirements of this Article 8 have been satisfied.

8.4    *Options to Purchase Interests of Member.*  Each Member hereby grants to the Company and to the other Members, in that order, the option to purchase the Member's Membership Interest in the Company in the event of his or her death, incapacity, retirement, resignation, expulsion, bankruptcy, insolvency, or transfer of such Membership Interest pursuant to a divorce, marital dissolution or marital separation proceeding, or in the event the Member gives notice of his or her desire to sell his or her interest, on the following terms and conditions set forth in the balance of this Section 8.4.

(a)    Purchase of Membership Interest.  In the event that a Member shall die or become incapacitated or insolvent, or in the event the Member shall desire to sell its interest in the Company (in which event he shall give the Company notice of his desire to sell), the Company shall give written notice (the "First Notice") to all other Members of the occurrence of the event giving rise to the option to purchase as soon as practicable but no later than five (5) business days after the date on which the Company first has actual knowledge of the event in

question. The Company shall have fifteen (15) business days after the date of the First Notice to Members to exercise the option of the Company to purchase the interests of the Member in question by giving a written notice of the intention to exercise the option (a "Notice of Intention") to the Member in question (or her representative) and to all other Members. In the event the Company does not have Available Cash sufficient to effectuate the purchase of the interest in question, all Members acting together in accordance with their respective Proportionate Shares, or each Member acting separately or together with one or more but less than all additional Members, shall have the option to purchase the interests in question during the same fifteen (15) business day period, which option would be exercised by giving a written Notice of Intention to all Members. For purposes of this Article, a Member shall be deemed to be incapacitated if he or she is disabled and unable to manage her business affairs for a continuous period of at least six (6) months. For the purpose of this Article, the insolvency of a Member shall be deemed to have occurred when he or she is adjudicated a bankrupt under federal bankruptcy law or has executed and delivered an assignment for the benefit of his or her creditors.

      (b)    Capital Account as Purchase Price. The purchase price for the interest of the Member under this Section 8.4 shall be equal to the balance of the Capital Account of the Member whose interest is being liquidated as of the end of the calendar month preceding the date of the First Notice, adjusted as if the properties then owned by the Company and the other assets of the Company were sold at fair market value, all liabilities of the Company were paid and the Company was liquidated in accordance with the provisions of Article 10.

      (c)    Disputed Purchase Price. In the event that the purchaser of the interest of the Member and that Member cannot agree on the valuation of any real property of the Company, the properties that are the subject of a dispute shall be valued in accordance with the following procedure.

      (1)    Written Valuation Statement. Within thirty (30) days after a Notice of Intent shall have been given by the purchaser exercising a right to purchase the interest of the selling Member, the purchaser and the selling Member shall each develop a written statement reflecting their respective positions on the valuation of the properties of the Company. A copy of each statement shall be made available to the other party within the fifteen (15) day period. If the valuation position of the party with the higher valuation is within five percent (5%) of the lower valuation with respect to any property, the valuation of the property in question shall be the average of the two valuations.

      (2)    Appraisal of Capital Account. For any valuation not resolved under subparagraph (d), the purchaser and the selling Member shall each designate one (1) appraiser to be an arbitrator of the valuation dispute. The arbitrators so designated shall be unaffiliated with and independent of both parties and shall be active members of the Appraisal Institute with not less than ten years of experience appraising properties of the same general nature of the properties that are in dispute.

(3)   <u>Resolution of Arbitrators' Dispute</u>. Within twenty (20) days after the initial submission of the position statements to the arbitrators, each arbitrator shall independently determine which statement resolves the valuation dispute by best reflecting the market value of the properties in question. If both arbitrators agree on the position of one (1) of the parties, that position shall be implemented by the Company and the purchaser and selling Member in effectuating the transfer of the Company interest in question. If the arbitrators disagree, the arbitrators shall appoint as an arbitrator a third independent and unaffiliated appraiser meeting the same qualifications who shall be provided with the statements and all supplemental information. The decision of the third arbitrator designating the position of a party which best resolves the valuation dispute shall be binding on all parties to the dispute and shall be implemented by the Company and the purchaser and the selling Member in effectuating the purchase of the Company interests in question. The determinations of value made shall not be binding on the Members not involved in the valuation dispute for any purpose, or upon the Company except with respect to the particular dispute being resolved.

(4)   <u>Allocation of Costs of Arbitration</u>. The costs of the arbitration, specifically including the professional fees of the arbitrators and all attorneys' fees reasonably incurred by all parties to the arbitration and the arbitrators, shall be borne by the party whose position is not adopted by the arbitrators.

(d)   <u>Terms for Payment of Purchase Price</u>. In the event that the purchaser of the interest of the Member and that Member, or his or her legal representative, as appropriate, cannot agree on the terms for payment of the purchase price for such interest, then upon the exercise of the right to purchase, or upon a purchase pursuant to an obligation to purchase, the interest of a Member hereunder (and in the case of a deceased Member, within a reasonable time following his or her death and upon the qualification of a legal representative of his or her estate), the purchaser shall pay the Member whose interest is being sold, or the legal representative of such Member, as appropriate, twenty percent (20%), or more, of the purchase price of the interest of the Member, at the price determined in accordance with the provisions above. Should the amount paid by the purchaser to the Member or his or her legal representative hereunder be less than the full purchase price to be paid for the interest being acquired, then concurrently with the payment of such amount the purchaser shall execute and deliver to the Member or his or her legal representative a Promissory Note which shall aggregate the total unpaid balance of the purchase price owing for the Member's interest, which Promissory Note shall be payable in five (5) equal annual installments commencing on the date of the first anniversary of the execution of the Promissory Note. The note shall bear interest at the higher of (1) eight percent (8%) per annum, simple interest, or (2) the lowest permissible "<u>Applicable Federal Rate</u>," under Section 1274 of the Code in effect at the time execution of the note, and each payment made by the purchaser shall be applied first to the payment of interest and then to the reduction of principal. The note shall provide that in the event of default in payment of interest or of principal, all future installments shall become due and payable immediately. Further, in the event of default, interest shall be assessed at the highest legal rate and if collection is necessary, the costs of collection, including a reasonable attorney's fee, shall be assessable against the purchaser. The note shall be subject to prepayment, in whole or in part, by the

purchaser at any time, and shall be assignable by the holder thereof.

(e)   <u>Transfer of Membership Interest</u>.  Upon receipt of the purchase price in cash, or in cash and by Promissory Note, as provided above, in payment of said interest, the Member or his or her legal representative, as appropriate, shall execute and deliver to the purchaser of the interest such instruments as are necessary and proper to transfer full and complete title to the interest of the purchaser; provided, however, that the purchaser shall immediately assign to the Member or his or her legal representative, as appropriate, as collateral security for the payment of the unpaid balance of said Promissory Note issued by the purchaser to said Member or his or her legal representative, such number of said shares as shall equal in value, as determined by this Agreement, the amount of said unpaid Promissory Note.  The security shall then be released by the Member or his or her legal representative, as appropriate, proportionately as the note is paid by the purchaser.

8.5   ***Rights of First Refusal of Members.***  In addition to the option rights granted under Section 8.4, the remaining Members shall have the right of first refusal to acquire the interest of any Member who is offering his interest in the Company to any third party, on terms and conditions identical to those of the proposed sale.  Prior to a proposed sale, written notice of the price and terms of the proposed sale, together with the identity of the proposed buyer, must be provided to the other Members, which notice shall constitute an offer of the interest to the other Members on the terms and conditions set forth in the notice.  Failure of the Members to accept the offer within thirty (30) days after delivery of the notice to them shall constitute rejection of the offer.  In the event that the Members reject the offer (and after the other provisions of this Article have been satisfied), the selling Member shall have the right to sell the interest to the proposed buyer identified in the written notice, provided that the sale is made on terms and conditions identical to those disclosed in the written notice to the Members and that a binding written agreement of sale is entered into within thirty (30) days after the rejection by the Members, and that all of the Members consent to the sale as set forth in Section 8.1, above.

8.6   ***Transfer Provisions Binding.***  Any sale, assignment or transfer or purported sale, assignment or transfer of any interest in the Company, whether voluntary or involuntary, shall be null and void unless made strictly in accordance with the provisions of this Article.  Any transferee who has properly acquired the interest of a Member of the Company shall be subject to all the terms, conditions, restrictions, and obligations of this Agreement, including the provisions of this Article.  The purported interest of any transferee who has not properly acquired the interest of a Member of the Company in accordance with this Article shall have no rights whatsoever, except and only to the extent that it is impossible under the law to terminate or restrict such rights, and then such rights shall be terminated or restricted to the maximum extent allowable under the law, and such interest shall be subject to all the terms, conditions, restrictions, and obligations of this Agreement, including the provisions of this Article.  A transferee who has properly acquired the interest of a Member of the Company may become a Member of the Company only if the transferee is admitted as a Member in accordance with the provisions of Article 9.  If such transferee is not so admitted, then such transferee shall have no right to participate in the management of the business and affairs of the Company or to become a

Member; the only rights to which such transferee shall be entitled are the share of profits or other compensation by way of income and the return of contributions to which the transferor was entitled.

## ARTICLE 9
### ADMISSION OF ADDITIONAL MEMBERS OR SUBSTITUTE MEMBERS

9.1    *Additional Members; Substitute Members.*  No Person may be admitted to the Company as an Additional Member or a Substitute Member without the prior written, unanimous consent of all the Members.  Contemporaneous with the execution of such unanimous written consent of all the Members, the Additional Member or Substitute Member must execute and deliver a writing to the other Members of the Company in which he agrees to be bound by all of the terms and provisions of this Agreement.  In the event that an Additional Member or Substitute Member makes a Capital Contribution to the Company in return for admission into the Company, the share of such Additional Member or Substitute Member and all other Members in the capital and the Profits and Losses of the Company shall be in such proportion as may be agreed upon among all of the Members.  In the event Additional Members or Substitute Members are admitted to the Company, the Members shall file with the Division an amendment to the Articles, as required by law.

## ARTICLE 10
### DISSOLUTION, WINDING UP AND CANCELLATION

10.1    *Events Causing Dissolution.*  The Company shall be dissolved and its affairs shall be wound up when any one or more of the following occurs:

(a)    The term of the Company expires.

(b)    If there are no Members.

(c)    If, upon a Dissociation by a Member or the occurrence of one of the events specified in Article 7, above, the business of the Company is not continued pursuant to the provisions of said Article 7.

(d)    All Members vote to dissolve the Company.

10.2    *Method of Winding Up and Cancellation.*  Upon the occurrence of any event causing dissolution as provided in paragraph 10.1, above, the Company shall immediately commence to liquidate and wind up its affairs.  The Members shall continue to share profits and losses during the period of liquidation and winding up in the same proportions as before commencement of winding up and dissolution.  Any gain or loss in disposition of the Company properties in the process of liquidation and winding up shall be credited or charged to the Members in the ratio of their Proportionate Share as provided in Article 3.  The proceeds from the liquidation and winding up shall be applied in the following order:

     (a)     To creditors of the Company, including Members who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Company other than those liabilities to Members on account of their contributions or on account of a Member's withdrawal from the Company or pursuant to a withdrawal of capital.

     (b)     To the Members in repayment of the amount of their respective Capital Accounts after taking into account all capital account adjustments for the taxable year during which the liquidation occurs (other than those made pursuant to this subsection 10.2(b)).

For purposes of determining the amount of such distributions, all Company assets shall be valued by the liquidator at their then fair market value, and any gains or losses that arise from their sale at such valuation or, in the event of distributions to be made in kind, that would arise assuming such a sale were made, shall be allocated as specified in Article 3 and in accordance with Treasury Regulations § 1.704-1(b)(2)(iv)(f).

When all debts, liabilities, and obligations of the Company have been paid or discharged, or adequate provision has been made to do so, and all of the remaining property and assets of the Company have been distributed to the Members, Articles of Dissolution shall be executed and filed with the Division as required by Section 48-2c-1204 of the Act.

### ARTICLE 11
### ENCUMBRANCES

11.1    *Encumbrances Prohibited.*  Except as provided in Article 8, no Member shall in any way encumber, pledge, hypothecate, or otherwise use his or her Membership Interest or Proportionate Share as collateral or security for an obligation, without the prior written consent of all the Members.

### ARTICLE 12
### MISCELLANEOUS

12.1    *Amendment.*  This Agreement may be amended at ay time by the unanimous written consent of all of the Members.

12.2    *Notices.*  Any notices to or among the Members shall be in writing and shall be sent registered mail, return receipt requested, to the address of each Member as the same appears in the books and records of the Company.  Notice shall be deemed to be received on the earlier of the date actually received or the third day after being deposited in the United States mail as above described.

12.3    *Entire Agreement.*  This Agreement shall constitute the entire contract between the parties, and there are no other or further agreements outstanding not specifically mentioned herein.

12.4    *Construction*. It is the intent of the parties hereto that each Member be recognized as a partner for purposes of Section 704(e) of the Code, and that the distributive share of each Member in the profits and losses of the Company shall be included in his or her gross income. All provisions of this Operating Agreement shall be construed in accordance with this expressed intention.

12.5    *Invalidity*. If any part of this Agreement is or shall be invalid or unenforceable for any reason, the same shall be deemed severable from the remainder hereof, and shall in no way affect or impair the validity of this Agreement, or any other portion thereof.

12.6    *Execution of Further Instruments*. The Members shall cooperate with each other in good faith to accomplish the objectives and purposes hereof, and to that end, from time to time, they shall make, execute and deliver such other and further instruments as may be necessary or convenient in the fulfillment of this Agreement.

12.7    *Headings*. The headings in this Agreement are included solely for convenience of reference, and shall not be construed as limiting or in any other way modifying the text of the Agreement.

12.8    *Counterparts; Facsimile Signatures*. This Agreement may be signed in any number of counterparts, each of which shall constitute an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. The parties hereto agree that transmission to the other party of this Agreement with its facsimile signatures shall bind the party transmitting this Agreement by facsimile in the same manner as if such party's original signature had been delivered. Without limiting the foregoing, each party who transmits this Agreement with its facsimile signature covenants to deliver the original thereof to the other party as soon as possible thereafter.

12.9    *Agreement to be Binding*. This Agreement shall inure to the benefit of, and shall be binding upon, each of the Members and their respective personal representatives, executors, heirs, successors and assigns (including successors and assigns by operation of law and involuntary event, as well as by voluntary act).

12.10    *Governing Law and Jurisdiction*. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah without giving effect to any applicable conflicts of law provisions. The parties consent to the exclusive jurisdiction and venue of the federal and state courts residing in the State of Utah for the resolution of any disputes arising under or out of this Agreement.

12.11    *Attorneys' Fees*. If any party shall breach any of the provisions of this Agreement, the nonbreaching party shall be entitled to recover from the other party all costs and expenses incurred by the nonbreaching party in connection with the breach, including reasonable

attorneys' fees, whether such costs and expenses are incurred with or without suit or before or after judgment.

12.12 ***Provisions Contrary to Act; Severability.*** To the extent any provision of the Agreement varies or contradicts the general provisions of the Act, each Member hereby consents to such variation or contradiction. If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

12.13 ***Creditors.*** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company, or of any creditor of any Member of the Company.

12.14 ***Resolution of Disputes.***

(a)   Mediation. The parties will endeavor in good faith to resolve all disputes arising under or related to this Agreement by mediation according to the then prevailing rules and procedures of the American Arbitration Association.

(b)   Arbitration. If the parties fail in their attempt to resolve a dispute by mediation, they will submit the dispute to arbitration according to the then prevailing rules and procedures of the American Arbitration Association. Utah law will govern the rights and obligations of the parties with respect to the matters in controversy. The arbitrator will allocate all costs and fees attributable to the arbitration to the non-prevailing party thereof. The arbitrator's award will be final and binding, and judgment may be entered in any court of competent jurisdiction.

**[Remainder of Page Intentionally Left Blank; Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written. Each of the undersigned hereby acknowledges that he has read this Agreement.

Members:

_____
Edward Joseph Eyring

_____
Ryan Patano

_____
Jeffrey Whiting

**Exhibit A**

Names and Addresses of Members
Contributions to Capital,
and Membership Interests

| Name and Address of Member | Capital Contribution | Membership Interest |
|---|---|---|
| Edward Joseph Eyring<br>PO Box 980752<br>Park City, UT  84098 | Services | 20.9% |
| Ryan Patano<br>3418 South 2940 East<br>Salt Lake City, UT  84109 | $20,000<br>Services | 39.55% |
| Jeffrey Whiting<br>9184 Upper Lando Lane<br>Park City, Utah  84098 | $20,000<br>Services | 39.55% |
| Total | | 100.0% |

757719.2